[Crim. No. 2348. In Bank.—November 12, 1921.]

THE PEOPLE, Respondent, v. N. STEELIK, Appellant.

[1] CRIMINAL LAW—SYNDICALISM ACT—INCLUSION OF ACCOMPLICES—LACK OF UNCERTAINTY.—The Criminal Syndicalism Act (Stats. 1919, p. 281) is not void for uncertainty because it *ex industria* includes accomplices and defines with meticulous care numerous acts constituting an aiding and abetting of the principal crime, or because it punishes aiders and abettors where the crime advocated is not committed.

[2] ID.—INDICTMENT — CHARGE OF SEVERAL OFFENSES — EVIDENCE — PROOF OF SPECIFIC OFFENSE—VALIDITY OF JUDGMENT.—An indict-

ment for the crime of criminal syndicalism is sufficient to support the judgment of conviction, notwithstanding it charges in general terms acts and offenses not proven, where it specifically charges the offense proven, and no other offense or acts were proven or offered to be proven.

[3] Id.—Membership in Industrial Workers of World — Sufficiency of Indictment.—An indictment charging a defendant with being a member of an organization known and designated as the Industrial Workers of the World sufficiently charges an offense under subdivision 4 of section 2 of the Criminal Syndicalism Act of 1919.

[4] Id.—Acts Denounced by Statute—Constitutional Law.—The Criminal Syndicalism Act is not unconstitutional on the ground that it leaves to a court or jury the determination of whether or not the particular act or conduct of the defendant is adapted to the result denounced by the act, since the various acts mentioned in the statute are already denounced as wrongful under existing laws.

[5] Id.—Guaranty of Free Speech — Right not Violated.—The Criminal Syndicalism Act does not violate the right of free speech guaranteed in the federal and state constitutions.

[6] Id.—Right to Attack Constitutionality of Act.—A defendant not charged with or convicted of a violation of the Criminal Syndicalism Act involving anything that he said or published is not in a position to attack the constitutionality of the act on the ground that it is violative of the right of free speech.

[7] Id.—Treason Provisions of Constitutions—Acts Inimical to Public Welfare—Punishment not Prohibited.—The definitions of treason contained in the federal and state constitutions are merely for the purpose of limiting the number of offenses which can be punishable as treason under the common law, and in nowise limits the power of the legislature to provide for the punishment of acts inimical to the public welfare which theretofore might have been punished as constructive treason.

[8] Id.—Membership of Unlawful Organization—Evidence—Conduct of Members Prior and Subsequent to Enactment.—In a prosecution under the Criminal Syndicalism Act for being a member of an organization which in its nature is a criminal conspiracy to change industrial control and government by unlawful and criminal methods, evidence of the conduct of the members of the organization both before and after the passage of the act is admissible for the purpose of determining the character of the organization, where such organization after the passage of the act continued the publication of the same unlawful propaganda.

[9] Id.—Misconduct of Counsel—Appeal—Timely Objection.—Misconduct of counsel in argument to the jury must be made at the time as a basis for complaint in the appellate court.

APPEAL from a judgment of the Superior Court of Los Angeles County. Frank R. Willis, Judge. Affirmed.

The facts are stated in the opinion of the court.

S. G. Pandit, J. H. Ryckman and Clore Warne for Appellant.

U. S. Webb, Attorney-General, Arthur Keetch, Deputy Attorney-General, Thomes A. Wood, Thomas Lee Woolwine, District Attorney, Asa Keyes, Deputy District Attorney, for Respondent.

WILBUR, J.—The defendant was charged with the crime of criminal syndicalism under a statute enacted in 1919 (Stats. 1919, p. 281). The indictment in the main follows the language of the statute and the defendant claims that the indictment is not sufficiently specific and that the statute is void for uncertainty, while the respondent relies upon the rule that an indictment in the language of the statute sufficiently charges a statutory offense. As the main contentions of the appellant are based upon the form of the indictment and the uncertainty of the statute, we will set out the charging part of the indictment. The indictment is as follows:

"The said . . . N. Steelik . . . are accused by the Grand Jury of the County of Los Angeles, State of California, by this Indictment, of a felony, to wit, CRIMINAL SYNDI-CALISM, committed at and in the County of Los Angeles, State of California, and before the finding of this Indictment, as follows, to wit:

"That on or about the 29th day of September, 1919, and before the finding of this Indictment, at the County and State aforesaid, the said defendants did then and there willfully, unlawfully and feloniously, by spoken and written words and personal conduct advocate, teach, aid and abet Criminal Syndicalism and the duty, necessity and propriety of committing crime, sabotage, violence and unlawful methods of terrorism as a means of accomplishing a change in industrial ownership and control and effecting political changes, and did then and there willfully, unlawfully, feloniously and deliberately by spoken and written words justify

and attempt to justify Criminal Syndicalism and the commission of and attempt to commit crime, sabotage, violence and unlawful methods or terrorism with intent to approve, advocate and further the doctrine of Criminal Syndicalism as a means of accomplishing a change in industrial ownership and control and effecting political changes; and did then and there willfully, unlawfully and feloniously publish, issue, circulate and publicly display certain books, papers, pamphlets, documents, posters and written and printed matter in other forms containing and carrying written and printed advocacy of teaching and aid and abetment of and advising Criminal Syndicalism, to wit: Advocating terrorism and advising the commission of crime, sabotage, and other willful and malicious damage and injury to property and unlawful acts of force and violence and unlawful methods of terrorism as a means of accomplishing a change in industrial ownership and control and effecting political changes; and did then and there willfully, unlawfully and feloniously organize and assist in organizing, and they are and each of them is and each of them knowingly became a member of an organization, society, group and assemblage of persons known and designated as the 'Industrial Workers of the World' and sometimes known and referred to as the 'I. W. W.' and sometimes known and referred to as the 'One Big Union' and which said organization, society, group and assemblage of persons was then and there organized and assembled to advocate, teach, aid and abet Criminal Syndicalism as a means of accomplishing a change in industrial ownership and control and effecting political changes;

"All of which is contrary to the form, force and effect of the statute in such cases made and provided, and against the peace and dignity of the People of the State of California."

The statute, which we will hereinafter refer to as the Criminal Syndicalism Act, in section 1 defines criminal syndicalism and sabotage as follows:

"Section 1. The term 'criminal syndicalism' as used in this act is hereby defined as any doctrine or precept advocating, teaching or aiding and abetting the commission of crime, sabotage (which word is hereby defined as meaning willful and malicious physical damage or injury to

physical property), or unlawful acts of force and violence or unlawful methods of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change.''

Subdivisions 1, 2, and 3 of section 2 punishes one who advocates or encourages or justifies criminal syndicalism. Section 4 punishes one who assists in organization of a society to teach, aid, or abet criminal syndicalism, and subdivision 5 prohibits the commission of crime in furtherance of criminal syndicalism. Section 2, *inserting therein the definition of ''criminal syndicalism'' and ''sabotage'' contained in section 1* in lieu of the words ''criminal syndicalism'' and ''sabotage'' contained in section 2, reads as follows:

''1. By spoken or written words or personal conduct advocates, teaches or aids and abets any doctrine or precept advocating, teaching or aiding and abetting the commission of crime, willful and malicious physical damage or injury to physical property, or unlawful acts of force and violence or unlawful methods of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change, or the duty, necessity or propriety of committing crime, willful and malicious physical damage or injury to physical property, violence or any unlawful method of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change; or

''2. Willfully and deliberately by spoken or written words justifies or attempts to justify any doctrine or precept advocating, teaching or aiding and abetting the commission of crime, willful and malicious physical damage or injury to physical property, or unlawful acts of force and violence or unlawful methods of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change, or the commission or attempt to commit crime, willful and malicious physical damage or injury to physical property, violence or unlawful methods of terrorism with intent to approve, advocate or further the doctrine or precept advocating, teaching or aiding and abetting the commission of crime, willful and malicious physical damage or injury to physical property, or unlawful acts of force and violence or unlawful methods of terrorism as a means

of accomplishing a change in industrial ownership or control, or effecting any political change; or

"3. Prints, publishes, edits, issues or circulates or publicly displays any book, paper, pamphlet, document, poster or written or printed matter in any other form, containing or carrying written or printed advocacy, teaching, or aid and abetment of, or advising, any doctrine or precept advocating, teaching or aiding and abetting the commission of crime, willful and malicious physical damage or injury to physical property, or unlawful acts of force and violence or unlawful methods of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change; or

"4. Organizes or assists in organizing, or is or knowingly becomes a member of, any organization, society, group or assemblage of persons organized or assembled to advocate, teach or aid and abet any doctrine or precept advocating, teaching or aiding and abetting the commission of crime, willful and malicious physical damage or injury to physical property, or unlawful acts of force and violence or unlawful methods of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change; or

"5. Willfully by personal act or conduct, practices or commits any act advised, advocated, taught or aided and abetted by the doctrine or precept advocating, teaching or aiding and abetting the commission of crime, willful and malicious physical damage or injury to physical property, or unlawful acts of force and violence or unlawful methods of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change, with intent to accomplish a change in industrial ownership or control, or effecting any political change;

"Is guilty of a felony and punishable by imprisonment in the state prison not less than one nor more than fourteen years."

Thus it will be observed, the Criminal Syndicalism Act prohibits the advocacy of crime, the organization of conspiracies to commit crime, and the commission of crime, having for its object the bringing about of political or industrial changes.

In considering the sufficiency of the statute and of the indictment, it should be noted that the language is unusually broad and comprehensive as well as tautological, partly because the statute expressly includes accomplices and those who engage in conspiracies to commit the crime denounced.

In defining crime it is not usual for the legislature to include in the definition those who are accomplices. In this state accomplices are liable as principals and may be charged as such. Section 31 of the Penal Code provides as follows: "Sec. 31. Who are principals. All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, and all persons counseling, advising, or encouraging children under the age of fourteen years, lunatics or idiots to commit any crime, or who, by fraud, contrivance, or force, occasion the drunkenness of another for the purpose of causing him to commit any crime, or who, by threats, menaces, command, or coercion, compel another to commit any crime, are principals in any crime so committed." Thus, every act in defining a crime under our system of law includes those who aid and abet its commission and such accomplices may be punished as principals for the perpetration of the crime which they aid and abet. **[1]** The fact that in the Criminal Syndicalism Act the statute *ex industria* includes accomplices and defines with meticulous care numerous acts constituting such aiding and abetting of the principal crime does not render the act uncertain, nor is the fact that the act punishes aiders and abettors of the crime where the crime advocated is not committed a reason for holding the law uncertain. On the contrary, such definition is for the purpose of making the law more certain and explicit.

In the case of *Spies* v. *People*, 122 Ill. 1, [3 Am. St. Rep. 320, 12 N. E. 865, 17 N. E. 898], we have an instance where those who were responsible for anarchistic propaganda were found guilty and executed for the resultant murder of policemen by a bomb at the Haymarket meeting in Chicago. Our Criminal Syndicalism Act, however, differs from the implied legislation contained in the definition of every crime, in that it punishes aiders and abettors of the crime denounced for their efforts to bring about such crime, even

before the criminal act they seek to bring about has actually been accomplished.

Section 5 provides punishment for those who commit the crime, and section 4 for those who organize or join organizations formed for the purpose of committing such crimes. The members of such an organization would, at common law, be punishable for conspiracy to commit crime.

It seems clear that not more than three crimes are described in the statute: First, the commission of a crime for the purpose of effecting the desired change; second, advocating the commission of such a crime, although it might not have occurred, and where the advocates would not therefore be accomplices in the crime; this would include those who print or write documents in furtherance of·such crime; and third, forming a criminal conspiracy for the purpose of committing such a crime.

The aiding and abetting of a contemplated crime, where it is an individual act, is not ordinarily punishable until the crime has been committed. But, if two or more join in the purpose, they become liable, as conspirators under our statute (sec. 182, Penal Code), punishable without any overt act, if the offense agreed to be committed is a felony upon the person of another or to commit arson or burglary. In all other cases it is essential that some overt act in furtherance of the conspiracy occur (sec. 184, Penal Code).

Under our system a person charged with a crime as principal may be convicted of aiding and abetting in that crime (sec. 31, Penal Code). So that an indictment charging a person with committing the crime of criminal syndicalism and also with aiding and abetting the same would be duplicative, if at all, only because aiding and abetting criminal syndicalism is punishable as such under this act where the criminal act advocated is not consummated. The only purpose of charging the defendant with aiding and abetting and advocating crime as well as the crime itself is to charge that advocacy as a crime, distinct from the commission of the crime so advocated. It would seem clear that an indictment so framed as to permit a conviction for the crime advocated and for the advocacy of the crime, if not committed, would charge two separate offenses, and that the law framed so as to cover both would also define two offenses. That subdivisions 1, 2, and 3 of section 2 do define a separate crime

is well illustrated by the fact that the *justification* of crime denounced in section 2, subdivision 2, *supra,* would apply to crimes to be committed and those already committed. Both are covered by section 1, as teaching or advocating crime, and both are punishable because of their tendency to cause new crimes of a similar nature.

The conspiracy denounced in subdivision 4, section 2, is also a separate and distinct crime, which may result in the commission of the crime advocated, in which event the conspirators can be charged as principals in the crime. If no such crime is committed the conspiracy to commit the crime is a separate offense from the crime and from aiding and abetting the crime where the latter is by an individual and not by a combination or organization. If, as a result of a conspiracy, crime is committed, section 2, subdivision 5, alone need be invoked.

In the case at bar no evidence was introduced of the consummation of any crime by the defendant or his associates for the purpose of effecting political or industrial changes. The evidence relied upon in this case for conviction was to the effect that the Industrial Workers of the World, hereinafter referred to as the I. W. W., was an organization which came within the provisions of section 4 and that the defendant was a member thereof. The defendant testified that he was a member of the I. W. W., having joined before the passage of the Criminal Syndicalism Act, and that he remained such member thereafter, and that he participated in the meetings of the organization. There was evidence to the effect that he was an authorized organizer thereof and acted in such capacity and personally advocated revolution and preached some of the doctrines denounced as criminal in the act. There was thus evidence before the jury that the defendant had violated section 2, subdivision 4, of the statute, that is, he knowingly belonged to a conspiracy to commit crimes, in furtherance of industrial and political control.

There is overwhelming evidence in the case at bar to justify a conclusion by the jury that the I. W. W. is an organization as clearly denounced by the statute as unlawful as though it was mentioned by name. It therefore clearly appears from the evidence that the defendant has committed a crime denounced by the statute and is thus justly liable to suffer the penalty imposed by the statute, and there has

187 Cal.—24

been no miscarriage of justice in imposing upon him the penalty prescribed by law for the offense committed by him. Section 4½ of article VI of the constitution provides that no judgment shall be set aside in any cause for any error in pleading or procedure "unless after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

Of course, the mere fact that the record shows the defendant to be guilty of a crime does not conclusively determine that there has been no miscarriage of justice in imposing upon him the penalty prescribed by law therefor, for, if the defendant has not had a fair trial, there has been a miscarriage of justice.

The indictment must contain a statement of the acts constituting the offense in ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended (Pen. Code, sec. 950), and "It must be direct and certain, as it regards: . . . The particular circumstances of the offense charged, when they are necessary to constitute a complete offense" (Pen. Code, sec. 952), and the indictment is sufficient in that regard if "the act or omission charged as the offense is clearly and distinctly set forth in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended" (Pen. Code, sec. 959, subd. 6). "The indictment may charge two or more different offenses connected together in their commission, or different statements of the same offense, or two or more different offenses of the same class of crimes or offenses, under separate counts, . . . " (Pen. Code, sec. 954).

Assuming that the indictment is sufficiently definite and certain in charging several different offenses, no injury resulted to the defendant by reason of a failure to separate the charge into separate counts. Indeed, he is the gainer thereby, as only one penalty can be imposed.

It is claimed that the indictment in this case is so broad and comprehensive in its allegations, so indefinite and uncertain in its specifications, that the defendant was not properly advised of the nature of the charge against him, and was thus convicted without that due process of law

guaranteed to him by the federal and state constitutions. It is true that the language of the indictment is very comprehensive and would justify the proof of a multitude of acts which would be comprehended within the terms of the statute and the indictment thereunder. On the other hand, it is specifically alleged in the indictment that the defendant was a member of the I. W. W., knowing its alleged purposes. As to that charge he was therefore fully advised, and the evidence clearly shows his guilt. The evidence introduced against the defendant was all germane to that charge. The evidence as to the character of the organization and his membership was admissible to support the charge, and the testimony as to his statements and activities were admissible to show his knowledge of and sympathy with the purposes of the organization. No evidence is called to our attention which was not pertinent to this specific charge.

[2] We are thus confronted with the question as to whether or not we should reverse this case because the indictment was comprehensive enough to charge in too general terms acts and offenses, not in fact proved, where it clearly and specifically charged the offense proved on the trial, and no other offense or acts were proved or offered to be proved. The general rule is that surplusage may be rejected if sufficient remains in the indictment to charge the offense proved and that uncertain and duplicitous averments may be treated as surplusage and rejected. (22 Cyc. 367–369.) Under this rule the indictment was sufficient to support the judgment.

If we are correct in holding that the only just criticism of the indictment is that it included other offenses than the specific one of knowingly remaining a member of the I. W. W. and that the evidence was in fact confined to that issue, then we are directed by the constitution not to reverse the judgment against the defendant for any error as to any matter of pleading, "unless after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." It is clear that mere surplusage in the indictment would not result in any miscarriage of justice as to a crime specifically charged and upon which upon proper evidence the defendant was found guilty.

The defendant also complains of the trial for the reason that he is entitled to have the allegations against him re-

duced to such form that, in the event of either an acquittal
or conviction, he cannot be again tried for the same offense,
and that the indictment is not sufficiently certain to protect
him in that regard. The rule invoked by the defendant is
one for the testing of the sufficiency of an indictment (*People*
v. *Mahony,* 145 Cal. 104, 106, [78 Pac. 354]), and is en-
titled to consideration under the rule which limits the power
of this court on appeal (art. VI, sec. 4½). We think it
clear, however, that the evidence and verdict are directed
to the membership of the defendant in the I. W. W. and that
this prosecution would bar another on that issue. It is
therefore unnecessary to consider whether it would bar a
prosecution for some other act included therein. If so, he
is to that extent benefited by the unnecessary averments of
the indictment, and is not prejudiced in this case thereby.

[3] We are not required in the case at bar to determine
whether or not the general language of subdivisions 1, 2,
and 3 is sufficient when used in a statute to define an offense
or in an indictment to charge an offense, for the reason
that the defendant is specifically charged with belonging to
the I. W. W. and thus an offense is charged under subdi-
vision 4, section 2, of the act.

[4] Appellant attacks the constitutionality of the statute
because it denounces acts and conduct "as a means" of ac-
complishing political change or change in industrial owner-
ship, thus leaving to a court or jury to determine whether
or not the particular act or conduct of the defendant is
adapted to the result denounced by the statute. In consid-
ering that question it should be noted that the Criminal
Syndicalism Act does not undertake to define the various
acts, the advocacy of which is punishable under the statute.
Such acts are already denounced as wrongful under existing
laws. They are (1) the "commission of crime," (2) "will-
ful and malicious physical damage to physical property,"
(3) "Unlawful acts of force and violence," (4) "Unlaw-
ful methods of terrorism." We must look to the general
law of the state to determine what are "unlawful acts of
force and violence," and what are "unlawful methods of
terrorism," and to ascertain what acts are crime. The "ma-
licious physical damage to physical property" is evidently
synonymous with malicious mischief and arson, and other
unlawful acts resulting in the damage to or destruction of

physical property. These wrongful acts, most of them already punishable by the criminal law, are denounced by the statute and made felonious when done, or advocated as a means of political or industrial change. The Criminal Syndicalism Act might be summarized as an act to punish the advocacy of crime or wrong, engaging in conspiracies to commit crime or unlawful acts, or the commission of crime or unlawful acts as a means of changing industrial or political control. It is proper to seek desired changes in political and industrial control, but when criminal or unlawful means are used to effect political control, the means is punishable under the act defining and prohibiting criminal syndicalism, as well as under the act defining the crime. The latter act is no more uncertain than the one denouncing criminal conspiracy as a conspiracy to commit any act "injurious to the public health" "or to public morals" or the "perversion and obstruction of justice" "or due administration of the laws." (Sec. 182, Pen. Code.)

This same question was considered by the supreme court of the state of Washington in *State* v. *Hennessy,* 114 Wash. 351, [195 Pac. 211, 215], and in *State* v. *Fox,* 71 Wash. 185, [127 Pac. 1111]. An act defining criminal syndicalism was sustained in the former case, and an act defining criminal anarchy in the latter case. Both acts were couched in much the same language as our Criminal Syndicalism Act. Without further discussion we accept the conclusions of the supreme court of Washington in *State* v. *Hennessy, supra,* and, although the statute there under consideration is somewhat different in terms from ours, the principle there announced is fully applicable here.

We have twice had before us the question of the validity of this act: *In re McDermott,* 180 Cal. 783, [183 Pac. 437], where an application for a writ of *habeas corpus* was denied, and in *Whitney* v. *Superior Court,* 182 Cal. 114, [187 Pac. 12]. In the case of *In re McDermott, supra,* the application for a writ of *habeas corpus,* after defendant had been held to answer, was based upon the grounds that the defendant had been held to answer without probable cause and that the law was unconstitutional. It appears from an examination of the petition therein that the points specified by the petitioner in that case as the basis for the claim of the unconstitutionality of the statute were "the ambiguity of the

statute in that a person of common intelligence cannot understand just what not to do in order not to violate any of its five subdivisions of section 2, in this, to wit: That it cannot be ascertained by reading said law whether it is a crime and a violation of said act for any person to read in public any book, paper, pamphlet, document, poster or written or printed matter in any other form; to use the language of the act; containing, or carrying written or printed advocacy, teaching, or aid and abetment of, or advising 'criminal syndicalism' as set out in subsection 3 of said act, if in said reading the person publicly displays said book, pamphlet or other written or printed matter, no matter how innocent of violating said law said person might be; that the act was ambiguous in that it cannot be ascertained therefrom just what is meant by 'unlawful methods of terrorism' as contained in section 1 of said act and elsewhere, as a person of common intelligence would reasonably conclude after reading said act that there is such a thing as 'lawful methods of terrorism'; that the complaint under which the petitioner was held was also defective and void in that it did not state a public offense because it is not sufficiently direct and certain,'' etc. The petition was filed July 25, 1919, and was denied July 31, 1919, without argument, because the court was thoroughly satisfied that the law was immune from the attack against it. The evidence upon which the petitioner was held to answer in that case, as in this, showed that the defendant was a member of the I. W. W. and had knowledge of its character. The decision in the McDermott case upholds the constitutionality of the Criminal Syndicalism Act in so far as it defines the crime mentioned in subdivision 4, section 2. We have considered the arguments made here attacking the constitutionality of the law, and see no reason to change the conclusion reached in the McDermott case (*supra*).

In the case of *Whitney* v. *Superior Court et al., supra,* an application was made for writ of prohibition to prevent the superior court of Alameda County from proceeding with the trial of the petitioner upon an information charging the petitioner with violating the Criminal Syndicalism Act. This court in denying the petition said: ''We see no merit in the claim that the act under which petitioner is being prosecuted is invalid as being in violation of provisions of

our federal and state constitutions.'' The point of attack in that case as to the constitutionality of the law was that it violated section 24 of article IV of the constitution prohibiting a legislative act embracing more than one subject.

[5] Notwithstanding these decisions in general terms approved the constitutionality of the statute, the defendant argues with great learning that the statute under consideration violates the right of free speech guaranteed in the federal and state constitutions and for that reason is unconstitutional and void.

The right of free speech was guaranteed to prevent legislation which would by censorship, injunction, or other method prevent the free publication by any citizen of anything that he deemed it was necessary to say or publish. (See notes, 15 Ann. Cas. 3, 4; 6 R. C. L., sec. 239 et seq.) The right of free speech does not include the right to advocate the destruction or overthrow of government or the criminal destruction of property. The Criminal Syndicalism Act does not violate the right of free speech. (*State* v. *Hennessy, supra; People* v. *Most,* 171 N. Y. 423, [58 L. R. A. 509, 64 N. E. 175].) It is expressly provided in our constitution that the publisher is liable for an abuse of this power and for any unlawful publication. This statute does not prevent the publication; it punishes the publisher, and declares punishable the character of publication denounced by the act as illegal. The legislature has power to punish propaganda which has for its purpose the destruction of government or the rights of property which the government was formed to preserve. (*People* v. *Most, supra.*) It is clear that the statute does not violate the right of free speech as defined by law. [6] The defendant, however, is not in a position to raise the point, for he is not charged with or convicted of a violation of the Criminal Syndicalism Act involving anything that he said or published as hereinbefore indicated.

[7] Appellant contends that the offense with which he is charged comes under the common-law definition of constructive treason, and that therefore he cannot be punished because of the definition of treason contained in the federal and state constitutions. These definitions are merely for the purpose of limiting the number of offenses which can be punishable as treason under the common law, and in nowise

limits the power of the legislature to provide for the punishment of acts inimical to the public welfare which theretofore might have been punished as constructive treason. (*State* v. *Hennessy, supra; Ex parte Bollman,* 8 U. S. (4 Cranch) 75, [2 L. Ed. 554, see, also, Rose's U. S. Notes].)

On the whole, therefore, we hold that the record justifies the conviction of the defendant of the offense of criminal syndicalism in that he knowingly belonged to an organization which in its nature was a criminal conspiracy to change industrial control and government by unlawful and criminal methods.

It remains to consider the various objections to the evidence presented by the defendant. The principal one is to the testimony of two members of the I. W. W. as to various criminal acts committed by members of that organization before the defendant joined the organization and before the passage of the Criminal Syndicalism Act. It is urged that the defendant is not bound by the conduct of his associates before he joined with them, and that to convict him in this proceeding with a violation of a statute subsequently passed would make the law, in effect, an *ex post facto* law.

[8] In this case, the only question the defendant can be heard upon is whether or not the evidence of the conduct of members of the I. W. W. before the passage of the act is admissible as tending to establish the character of the organization after the passage of the act and during the time the defendant belonged thereto. It seems too clear for discussion that where the issue involves the character of an organization it is proper to determine the character of the organization from the conduct of its members and officers, including the propaganda which it publishes. It is no doubt true that the presumption of innocence would overcome the legal presumption that when the nature of a thing is once shown, it is presumed that it continues thereafter as long as such thing usually continues (Code Civ. Proc., sec. 1963, subd. 32). But where such proof is fortified by actual proof that subsequent to the passage of the act the organization continued to publish the same sort of propaganda, it is proper to consider the evidence of the conduct of the organization both before and after the passage of the statute in order to determine whether or not it is such an organization as is denounced by the statute. As the defendant knowingly con-

tinued his membership in the organization after such conduct had been denounced by the statute as criminal, he is liable, not for what the organization did before he joined it or for its character before the statute was passed, but because after the statute was passed he violated the terms thereof by knowingly remaining a member thereof.

It is contended that the evidence of these members of the I. W. W. was inadmissible for the further reason that it consisted of declarations of co-conspirators and was not admissible until the conspiracy was established by other evidence than such declarations. In making this contention the appellant wholly misconceives the applicability of the rule with reference to the declarations of co-conspirators. The evidence adduced in court by the co-conspirators as witnesses are not declarations of conspirators, but direct testimony to the facts to which they testify. Aside from the discredit which attaches to them as accomplices, their evidence is entirely competent to establish the facts to which they testify. The rule for which counsel contends is applicable only when it is sought to introduce extrajudical declarations and statements of co-conspirators.

[9] Probably the most serious complaint made by appellant is that of misconduct on the part of the district attorney in his argument to the jury. It was partly because of the character of the argument, portions of which were set out in the opinion of the district court of appeal of the second district, second division, that we ordered a transfer to this court. The misconduct alleged consisted of vigorous and scathing denunciation of the defendant and particularly of his counsel. During this denunciation the defendant made no objection. He neglected to call the attention of the court to the character of the argument and statements or the prejudicial effect anticipated therefrom. The court however, instructed the jury that it must disregard the remarks of the counsel and not consider them as evidence, and would only be justified in convicting upon the evidence upon the trial of the case. It is well settled that an appellate court will not consider a claim as to the misconduct of counsel in argument unless objection is made at the time. (*People* v. *Fleming,* 166 Cal. 357, 371, 377, [Ann. Cas. 1915B, 881, 136 Pac. 291].)

Appellant claims that the remarks of the district attorney were of such a prejudicial character as to have precluded any possible curative action by the trial judge, and for that reason asks us to reverse the judgment. Assuming that the remarks of the district attorney were as prejudicial as counsel claim them to be, we must also assume that if seasonable objection had been made to that course of argument or conduct the district attorney would have refrained from other and further improprieties in his argument, failing in which the judge would have promptly and emphatically prohibited further violation of the proprieties by the district attorney. This being true, we have no means of ascertaining whether or not the more flagrant violations complained of and the most prejudicial remarks of the district attorney would have ever occurred if, at the beginning, the defendant, instead of sitting silently by, had made seasonable objection thereto. In any event, we cannot properly disregard the rule requiring that objection be made to prejudicial misconduct of the district attorney, as a basis for a complaint in this court.

Judgment affirmed.

Sloane, J., Shaw, J., and Lennon, J., concurred.

Rehearing denied.

All the Justices concurred.