## ARTHUR BERG v. STATE.

No. A-4809.   Opinion Filed Jan. 17, 1925.
(233 Pac. 497.)

(Syllabus.)

1.   **Constitutional Law—Treason—Criminal Syndicalism Act Constitutional.**   The Criminal Syndicalism Act (chapter 70, Session Laws 1919; sections 2219, 2220, and 2221, Comp. St. 1921) held constitutional so far as its provisions are material in a prosecution for circulating and displaying printed matter teaching, advocating and affirmatively suggesting criminal syndicalism or sabotage, and for circulating and displaying books and other printed matter prohibited by said act.

2.   **Same—Criminal Syndicalism Act not Violative of Right of Free Speech nor Void for Indefiniteness.**   That part of section 2221, Comp. St. 1921, defining criminal syndicalism as circulating and displaying printed matter advocating, teaching, or affirmatively suggesting crime, sabotage, etc., does not violate the right of free speech, and is not void for indefiniteness.

3.   **Treason—Criminal Syndicalism Statute not Violative of Constitutional Definition of Treason.**   The fact that treason is defined in the federal and the state Constitutions does not deprive the Legislature of the power to enact a statute intended to prevent the teaching of criminal syndicalism or sabotage as defined by the criminal syndicalism statute, and does not violate either the Constitution of the United States nor the Constitution of this state defining treason.

4.   **Indictment and Information—Information for Criminal Syndicalism Following Language of Statute Sufficient.**   Under Criminal Syndicalism Act, § 3, making criminal and prescribing the punishment for circulating or displaying books or printed matter advocating, teaching, or affirmatively suggesting syndicalism or sabotage, an information setting out the matter complained of

and following substantially the language of the statute is sufficient.

5. **Indictment and Information—Trial for Separate Offenses in Information Improper.** A defendant cannot be tried for two separate offenses in the same information or indictment.

6. **Same—Same Act Constituting Different Offenses Properly Set Forth in Separate Counts.** An information or indictment must charge but one offense; but when the same act may constitute different offenses, or the proof may be uncertain as to which of two or more offenses the accused may be guilty, the different offenses may be set forth in separate counts in the same indictment or information; but in such cases the information or indictment must show upon its face that the separate counts are all based upon one and the same transaction.

7. **Same—Information under Criminal Syndicalism Act Duplicitous.** The amended information in this case attempting to join the crime of circulating and displaying printed matter advocating, teaching, etc., of criminal syndicalism and the crime of being a member and organizer of an organization teaching and advocating, etc., criminal syndicalism, is not a statement of the same acts which constitute different offenses, and the attempt to so join renders the amended information duplicitous.

8. **Evidence—Articles Taken from Person Lawfully Arrested Admissible.** In case of a lawful arrest, the aresting officer may take from the person arrested any instruments of crime or anything else reasonably deemed necessary to his own or the public safety, and the use of such things on the trial of the person arrested is not objectionable as obtained by unlawful search and seizure.

Appeal from District Court, Pittsburg County; A. C. Brewster, Judge.

Arthur Berg was convicted of criminal syndicalism, and he appeals. Reversed and remanded.

John J. Carney, for plaintiff in error.

George F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

EDWARDS, J. The information is in two counts, in the first of which plaintiff in error is charged:

"* * * On or about the 27th day of December, in the

year of our Lord one thousand nine hundred and twenty-two and anterior to the presentment hereof, then and there willfully, wrongfully, unlawfully and feloniously print, publish, edit, issue and knowingly circulate, sell, distribute and publicly display, books, pamphlets, papers, handbills, posters and documents, the same being written and printed matter containing matter advocating, advising, affirmatively suggesting and teaching crime, criminal syndicalism, sabotage, to wit, Certain membership cards in words and figures, as follows, to wit, 'Industrial Workers of the World. Official Membership Book. Issued by authority of the General Executive Board of the I. W. W. The member is entitled to work in any industry of this organization where employment is obtainable when stamps are affixed showing the member to be in good standing. To be in good standing a member must be paid for current month. Preamble: The working class and the employing class have nothing in common. There can be no peace so long as hunger and want are found among millions of the working people and the few, who make up the employing class, have all the good things in this life. Between these two classes a struggle must go on until the workers of the world organize as a class, take possession of the earth, and machinery of production, and adolish the wage system. We find that the centering of the management of industry into fewer and fewer hands makes the trade unions unable to cope with the ever growing power of the employing class. The trade unions foster a state of affairs which allows one set of workers to be pitted against another set of workers in the same industry, thereby helping defeat one another in wage wars. Moreover, the trade unions aid the employing class to mislead the workers into the belief that the working class have interests in common with their employers. These conditions can be changed and the interests of the working class upheld only by an organization formed in such a way that all its members in any one industry, or all industries if necessary cease work whenever a strike or lockout is on in any department thereof, thus making an injury to one injury to all. Instead of the conservative motto, "a fair day's wage for a fair day's work," we must inscribe on our banner the revolutionary watchword, "Abolition of the wage system." It is the historic mission of the working class to do away with capitalism. The army of production must be organized, not only for the every-

day struggle with capitalists, but also to carry on production when capitalism shall have been overthrown. By organizing industrially, we are forming the structure of the new society within the shell of the old.' 'Labor is entitled to all it produces'; and certain official stamps, signs and indices of the I. W. W.'s, as follows, to wit: Stamp. Stamp. Stamp. Stamp."

In the second count the plaintiff in error is charged with being a member of, and an organizer, and voluntarily assembled, in a society teaching the doctrine of criminal syndicalism and sabotage, to wit, Industrial Workers of the World.

The facts as gathered from the record are substantially as follows:

"The plaintiff in error was, by his own evidence, an oil field worker, and was on his way from El Dorado, Ark., to Drumright, Okla. He was arrested in the town of Haileyville on the 27th day of December, 1922, which was during the time of a railway strike. It appears that he had ridden into town on a freight train; had been there but a short time, probably not more than an hour or such a matter and was waiting to catch another freight train and ride out when he was stopped on the railroad right of way by four special officers, who had no warrant or search warrant, and was searched, and the papers and documents in question taken from his person. He was turned over to the chief of police at Haileyville and later convicted of vagrancy."

Upon the trial the jury returned a verdict finding the plaintiff in error guilty upon the first count of said information and not guilty upon the second count. The record was made up in the regular way, and the plaintiff in error presents four assignments of error as follows:

"First. Of the introduction of the evidence secured by the unlawful search and seizure.

"Second. That the information upon which plaintiff in error was tried is defective.

"Third. That plaintiff in error was not permitted to

propound certain questions to the jurors on voir dire examination.

"Fourth. That the statute under which plaintiff in error was convicted attempts to create and define a new kind of treason, and is, therefore, unconstitutional."

We will notice these assignments of error, first, however, considering No. 4, under which the information is drawn. This is based on sections 1, 2, and 3, chapter 70, of the Session Laws of Oklahoma of 1919; sections 2219, 2220, and 2221 of Compiled Statutes 1921, which reads as follows:

"Section 1. Criminal syndicalism is hereby defined to be the doctrine which advocates crime, physical violence, arson, destruction of property, sabotage, or other unlawful acts or methods, as a means of accomplishing or effecting industrial or political ends, or as a means of effecting industrial or political revolution, or for profit.

"Sec. 2. Sabotage is hereby defined to be a malicious, felonious, intentional or unlawful damage, injury to or destruction of real or personal property of any employer or owner by his or her employee or employees, or any employer or employers or by any person or persons at their own instance, or at the instance, request or instigation of such employees, employers, or any other person.

"Sec. 3. Any person who, by word of mouth or writings, advocates, affirmatively suggests or teaches the duty, necessity, propriety or expediency of crime, criminal syndicalism, or sabotage, or who shall advocate, affirmatively suggest or teach the duty, necessity, propriety or expediency of doing any act of violence, the destruction of or damage to any property, the bodily injury to any person or persons, or the commission of any crime or unlawful act as a means of accomplishing or effecting any industrial or political ends, change, or revolution, or for profit; or who prints, publishes, edits, issues, or knowingly circulates, sells, distributes, or publicly displays any books, pamphlets, paper, handbill, poster, document, or written or printed matter in any form whatsoever, containing matter advocating, advising, affirmatively suggesting, or teaching crime, criminal syndicalism, sabotage, the doing of

any act of physical violence, the destruction of or damage to any property, the injury to any person, or the commission of any crime or unlawful act as a means of accomplishing, effecting or bringing about any industrial or political ends, or change, or as a means of accomplishing, effecting or bringing about any industrial or political revolution, or for profit; or who shall openly, or at all attempt to justify by word of mouth or writing, the commission or the attempt to commit sabotage, any act or physical violence, the destruction of or damage to any property, the injury to any person or the commission of any crime or unlawful act, with the intent to exemplify, spread or teach or affirmatively suggest criminal syndicalism; * * * is guilty of a felony."

It is argued at some length that said section is unconstitutional for the following reasons:

First. That it is an attempt to create and define a new kind of treason, and therefore in conflict with section 3 of article 3, and of articles 1 and 14 of the Amendments to the Constitution of the United States, and of section 16, article 2, of the Constitution of this state.

Second. That it is unconstitutional and void for the reason that it violates the constitutional right of free speech and that it does not clearly and explicitly name the acts which constitute the offense.

The section of the federal Constitution referred to is that defining and punishing treason, and the amendments are those pertaining to freedom of speech and the limitation on the states against passing any law which shall abridge the privileges and immunities of citizens. The section of the state Constitution referred to is that defining treason against the state.

It is generally said in effect that it is the province of the Legislature to declare what acts shall be deemed inimical to the public welfare and constitute a crime, and to prohibit the same. When that is done, judicial considera-

tion of such enactments is limited to the injury whether the constitutional rights of the citizen have been invaded. If not, the statute must stand, however harsh it may be.

It is to be borne in mind that the criminal syndicalism statute does not limit or make criminal the advocacy or propriety of bringing about a change in our industrial system by peaceful methods. The people have at all times an undeniable and indefeasible right to alter their form of government; the statute is directed against those who advocate the necessity or expediency of sabotage, violence, or terrorism as a means of accomplishing industrial or politiial reform, or the doing of things of an analogous nature such as distributing or displaying circulars, books, posters, etc., teaching or advocating criminal syndicalism.

Statutes similar or of similar import to the one here under consideration have quite generally been held constitutional.

The crime prohibited by section 3 of the act in question, above quoted, is to be distinguished from treason as defined by the federal and state Constitutions, in that "treason" requires more than mere words to constitute the offense. It requires some overt act and proof by two or more witnesses, while the offense here defined is an offense which consists of words only; the advocacy or teaching of crime as a means of effecting industrial or political ends, or for a profit. State v. Hennessy, 114 Wash. 351, 195 P. 211; Frohwerk v. U. S., 249 U. S. 204, 39 S. Ct. 249, 63 L. Ed. 561; Equi v. U. S., 171 C. C. A. 649, 261 F. 53; Wimmer v. U. S. (C. C. A.) 264 F. 11.

In the case of Frohwerk v. U. S., supra, which construed the Espionage Act of 1917 (U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp. 1919, §§ 10212a-10212h), the court said:

"Some reference was made in the proceedings and

in argument to the provision in the Constitution concerning treason, and it was suggested on the one hand that some of the matters dealt with in the act of 1917 were treasonable and punishable as treason or not at all, and on the other that the acts complained of not being treason could not be punished. These suggestions seem to us to need no more than to be stated."

In the earlier case of Ex parte Bollman, 4 Cranch, 126, 2 L. Ed. 554, 571, Chief Justice Marshall in rendering the decision says:

"Crimes so atrocious as those which have for their object the subversion by violence of those laws and those institutions which have been ordained in order to secure the peace and happiness of society, are not to escape punishment because they have not ripened into treason."

In People v. Steelik, 187 Cal. 361, 203 P. 78, the court said:

"Appellant contends that the offense with which he is charged comes under the common-law definition of constructive treason, and that therefore he cannot be punished because of the definition of treason contained in the federal and state Constitutions. These definitions are merely for the purposes of limiting the number of offenses which can be punishable as treason under the common law, and in no wise limit the power of the Legislature to provide for the punishment of acts inimical to the public welfare which theretofore might have been punished as constructive treason."

In the case of State v. Hennessy, 114 Wash. 351, 195 P. 211, the following reasoning was used:

"The third point is that the syndicalism statute amounts to an attempt to punish constructive treason and is unconstitutional. The argument in the appellant's brief on this question takes a wide range during the course of which the provision of the federal Constitution which provides that no law shall be made abridging the freedom of speech is quoted. Also the provision of the same Constitution (Const. U. S. Amend. 14, par. 1) which provides that no law shall be passed which abridges the privi-

leges and immunities of the citizens of the United States.
* * *

"The fact that treason is defined in the federal Constitution does not deprive the state Legislature of the power to enact the statute which is intended to prevent the teaching of crime, sedition, violence, or intimidation as a means of overcoming or destroying the present social order."

See, also, in this connection, State v. Hestings, 115 Wash. 19, 196 P. 13; State v. Hemhelter, 115 Wash. 208, 196 P. 581.

In the case of State v. Moilen, 140 Minn. 112, 167 N. W. 345, 1 A. L. R. 331, the court says:

"The contention that the statute violates rights granted and secured by the federal Constitution is without special merit. The design and purpose of the Legislature in the enactment of the statute was the suppression of what was deemed by the law makers a growing menace to law and order in the state, arising from the practice of sabotage and other unlawful methods of terrorism, employed by certain laborers in furtherance of industrial ends and in adjustment of alleged grievances against employers.

"The facts surrounding the practice of sabotage, and like in terrorem methods of self-adjudication of alleged wrongs, are matters of common knowledge and general public notoriety of which the courts will take notice. That they are unlawful and within the restrictive power of the Legislature is clear."

The District Court of Appeals of California, in the case of People v. Malley, 49 Cal. App. 597, 194 P. 48, based on the earlier case from the Supreme Court of that state of In re McDermott, 180 Cal. 783, 183 P. 437, upholds the California statute, and in doing so quotes and approves the opinion in the Minnesota case of State v. Moilen, supra. In various other decisions of the same state the act is upheld. Again, the Supreme Court of California, in the case of People v. Steelik, 187 Cal. 361,

203 P. 78, goes at length into the constitutional questions raised and sustains the act. The Supreme Court of Kansas appears to assume the criminal syndicalism statute of that state to be constitutional, without discussion. In re Danton, 108 Kan. 451, 195 P. 981.

The Supreme Court of New Jersey, in the case of State v. Quinlan, 86 N. J. Law, 120, 91 A. 111, upholds as constitutional a statute similar in meaning and effect to the statute here under consideration.

Argument is also made that the statute in question is unconstitutional as abridging the right of free speech granted by the Constitution. But we think it is so well settled that the right of free speech does not imply unrestricted license that no extended notice need be given to this assignment. The act defining criminal syndicalism as circulating and displaying printed matter advocating, advising, teaching, or affirmatively suggesting crime as a means of accomplishing industrial or political ends, or for a profit, is not a denial of the free speech granted by the Constitution.

It is also contended that the law in question is unconstitutional for the reason that it does not clearly and explicitly set out the acts which constitute the offense. This objection to the constitutionality of the act has been generally raised in the cases heretofore mentioned and the objection held not to be sound. The words used in the definition of the offenses, which are not defined in the act itself, have well-recognized meanings and the language used fairly defines the crime created by the statute. People v. Steelik, supra; People v. Malley, supra; State v. Workers Soc. Pub. Co., 150 Minn. 406, 185 N. W. 931; State v. Hennessy, supra.

The plaintiff in error further argues that the amended information on which the trial was had was duplicitous,

in that the first count charges the plaintiff in error with circulating, distributing, displaying, etc., * * * written and printed matter, advocating, advising, etc., criminal syndicalism, sabotage, etc., and that the second count charges that the plaintiff in error * * * did feloniously become, and was then and there, an organizer of * * * and became a member of and voluntarily assembled with a society and assemblage of persons which teaches the doctrine of criminal syndicalism, sabotage, etc. That the offenses charged are distinct and not based on the same acts.

Section 3 of the Criminal Syndicalism Act defines two separate offenses: First. The teaching, advocating, etc., or the circulating or displaying printed matter teaching, advocating, etc., of crime as a means of accomplishing industrial or political changes. Second. The organizing, becoming a member of, or voluntarily assembling with any society or assemblage of persons teaching, advocating, etc., crime as a means of accomplishing industrial or political charges. The first of these crimes is charged in the first count of the amended information; the second of said crimes is charged in the second count of said amended information.

There is no allegation that the acts alleged in the second count are the same pleaded in the first count, and the evidence does not indicate that the acts were in fact the the same.

Our statute, section 2558, Comp. St. 1921, is as follows:

"The indictment or information must charge but one offense; but where the same acts may constitute different offenses, or the proof may be uncertain as to which of two or more offenses the accused may be guilty of, the different offenses may be set forth in separate counts in the same indictment or information and the accused may be convicted of either offense, and the court or jury trying the cause may find all or either of the persons guilty

of either of the offenses charged, and the same offense may be set forth in different forms or degrees under different counts; and where the offense may be committed by the use of different means, the means may be alleged in the alternative in the same count."

The term "same offense," as used in this statute, does not mean the same class or kind of offense eo nomine, but means an offense committed by the same acts, transaction, or omission. Estep v. State, 11 Okla. Cr. 103, 143 P. 64.

Section 2558, supra, has often been construed by this court. It is well settled that separate offenses—that is, offenses committed by separate acts—may not be joined in a single information, and when so attempted to be joined, the information is duplicitous.

In the case of De Graff v. State, 2 Okla. Cr. 519, 103 P. 538, it is said:

"An indictment or information must charge but one offense; but when the same acts may constitute different offenses, or the proof may be uncertain as to which of two or more offenses the accused may be guilty, the different offenses may be set forth in separate counts in the same indictment or information; but in such cases the information or indictment must show upon its face that the separate counts all refer to one and the same transaction."

In Grant v. State, 6 Okla. Cr. 172, 117 P. 1100, it is held:

"An information which attempts to charge separate offenses against an accused not based upon the same transaction is duplicitous, and should be set aside, unless the state elects to go to trial upon one specific count, and dismisses the others."

In the case of Williams v. State, 16 Okla. Cr. 54, 180 P. 559, it is said:

"Where it is clear from the information, the evidence, the verdict, and judgment that the defendant was called

upon to defend against two separate and distinct offenses charged against him, over his repeated objections and exceptions, this court will not permit a conviction under such circumstances to stand unreversed, for the reason that such a conviction does not afford the defendant that fair and impartial trial according to the forms of law guaranteed to him by the Constitution and statutes of this state."

See, also, Kimbrell v. State, 7 Okla. Cr. 354, 123 P. 1027; Sturgis v. State, 2 Okla. Cr. 362, 102 P. 57; Shuford v. State, 4 Okla. Cr. 513, 113 P. 211.

The plaintiff in error complains of the ruling of the court in sustaining an objection to questions propounded to the prospective jurors for the trial of the case. Each juror examined on voir dire was asked this question:

"If it should appear in the trial of this case that the defendant is a member of an organization commonly known as the I. W. W., or Industrial Workers of the World, would that fact, if it should appear as a fact, prejudice you against the defendant?"

In each instance the state objected and the objection was sustained. The question may not be in the proper form, and counsel who appeared for the plaintiff in error did not vary the form or attempt to ascertain from the trial court the reason the objection was sustained. But in view of the gravity of this case, we believe the court should have been more liberal and have allowed counsel to develop the feeling, if any, of the jurors towards the I. W. W.'s; that the sustaining of the objection to the question was error.

Complaint is also made that it was error to admit in evidence the papers taken from the person of the plaintiff in error at the time of his arrest, as a violation of his rights against unlawful search. This court holds that property taken from the person of any one by an unlawful search of his person is not admissible in evidence

against him. But where an officer makes a lawful arrest, he may take from the person arrested any firearms, counterfeit money, burglar tools, or other papers or documents, or other matter to be used with criminal intent, and that such things so taken may be used as evidence against the person arrested. Gore v. State, 24 Okla. Cr. 394, 218 P. 545; Boyd v. U. S., 116 U. S. 619, 6 S. Ct. 524, 29 L. Ed. 746; Weeks v. State, 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 384, Ann. Cas. 1915C, 1177; Browne v. U. S. (C. C. A.) 290 F. 870; 2 R. C. L. 468; Baron et al. v. U. S. (C. C. A.) 286 F. 822; State v. Edwards, 51 W. Va. 220, 41 S. E. 429, 59 L. R. A. 465.

Upon the trial of this case the plaintiff in error took the stand and himself testified as to the possession of the papers introduced in evidence, against the admission of which he now complains.

Further complaint is made to the ruling of the court permitting the witness Nowlin to testify what the I. W. W. "stood for." The following appears from the record:

"Q. Mr. Nowlin, are you familiar with the organization known as the Industrial Workers of the World, commonly known as the I. W. W? A. I am somewhat familiar with them; yes, sir. * * *

"Q. Do you know what they stand for? (Objection; ruling; exception.) A. Yes, sir.

"Q. What do they stand for? (Objection; ruling; exception.) * * * A. Well, they stand for tearing down our flag and our form of government and establishing a form of government of their own, and worshipping the red flag instead of the American flag."

This evidence, we presume, was offered in support of the second court of the amended information, and as there was a verdict of not guilty on that count, it is probably not essential to review this assignment except for

the fact that it would militate against the plaintiff in error on the other count. We think this evidence in this form was incompetent and prejudicial to the rights of the plaintiff in error.

It is urged at some length that the evidence is insufficient to sustain the verdict and judgment. The only evidence sustaining the first count was three membership cards of the Industrial Workers of the World, the same as set out in the amended information hereinbefore quoted, with some stamps of four different designs. One design being a "Vol Ass't" stamp, showing oil derricks and tanks, with the design of the world and the name Industrial Workers of the World, and the value, thereon. Another design illustrates the head and shoulders of a person looking from a prison cell, with the words "Defense Stamp, 50c, 1922." Another is labeled, "General Stamp, value 50c, Industrial Union," with a view of the world, with the words "Industrial Workers of the World" thereon. Another is simply labeled "Monthly Dues, 50c, 1922" with a view of the world, with the words, "Industrial Workers of the World," thereon. The other matter admitted in evidence was mere instructions in detail as to keeping records, directions to the secretaries how to remit to the union, and how to transfer members, how to secure stamps, and matters of that kind.

The stamps referred to are not in any sense and apparently are not intended to be inflammatory. The circulating of them without connection with any other matter would not be a violation of the law.

The membership cards referred to and set out in the amended information are more objectionable. These words appear:

"The working class and the employing class have nothing in common. There can be no peace so long as

hunger and want are found among millions of the working people and the few, who make up the employing class, have all the good things of this life. Between these two classes a struggle must go on until the workers of the world organize as a class, take possession of the earth and the machinery of production, and abolish the wage system."

It will be noted that the words "no peace," "a struggle must go on," and "take possession of the earth," are used. Further on, "workers" are "pitted" against "workers." "Wage wars" are mentioned, and "a revolutionary watch word" is suggested. The "army of production" and the "everyday struggle with capitalists" is referred to. Taken in one sense, this smacks of military activity, armies, and fighting. But, on the other hand, it is just as reasonably or more reasonably construed to be metaphoric. It hardly conjures up to the mind actual armies and actual military engagements. "Onward Christian soldiers" does not mean that the zealous churchman is literally militant. The language of the membership card should be construed in favor of the plaintiff in error.

We think, too, that even if the membership cards were construed to have the meaning contended for by the state, there is no sufficient proof that plaintiff in error circulated or displayed them as contemplated by the statute. There is no proof that any one had knowledge of the existence of such papers prior to the arrest of the plaintiff in error. After his arrest and while in the custody of an officer, one of the witnesses, according to the testimony, asked him what he was arrested for, and he answered, "For being an I. W. W. or being an I. W. W. organizer," and then one of the officers who had him in custody came around and he asked the officer for the membership card, a red-backed booklet, and showed it to the witness. The witness and plaintiff in error testified very much the same in substance, except plaintiff in error states that the of-

ficer showed the membership card to the witness. The display, we think, was not such a public display as is forbidden by the statute, and if done by the plaintiff in error was a mere satisfying of the curiosity of the witness Kelley, and would not be sufficient on which to predicate a prosecution.

On account of the importance of the questions presented by this appeal, we have gone into the record thoroughly.

For the reason assigned, the cause is reversed and remanded.

The warden of the penitentiary is directed to deliver the plaintiff in error into the custody of the sheriff of Pittsburg county, who will hold him in custody subject to further proceedings according to law.

BESSEY, P. J., and DOYLE, J., concur.